Parker C. J.
delivered the opinion of the Court. [After reading St. 1795, c. 45, § 1, 2.] There is nothing equivo *587 ¿al or ambiguous in the terms of this statute, and the facts in the case before us come completely within it. They are so alleged in the indictment, and were so proved on the trial. The deceased was feloniously struck in the county of Suffolk, and he died of the same stroke in the county of Middle-sex. The grand jurors for the latter county found the indictment against the prisoners, and in the same county, before the Justices of the Supreme Judicial Court, sitting therein, they have been tried and convicted.
It is plain therefore that this objection cannot prevail, if the legislature had competent authority to enact this statute ; and their authority cannot be denied, unless it was restrained by some constitutional provision, or some clear declaration of the people, intended as a limitation or restraint of their authority.
It is contended that this limitation is furnished by the 13th article of the declaration of rights, the words of which are, In criminal prosecutions, the verification of facts in the vicinity where they happen, is one of the greatest securities of the life, liberty and property of the citizen.”
It might perhaps be urged, that this, being but a declaration of an abstract principle, was intended only as an admonition to legislatures, leaving them to the application of the principle as the public interest and convenience should dictate for the word vicinity is not technical, with a precise legal meaning, as the word county or the ancient word visne, vicinage, would be held to be.
And considering that the declaration of rights was framed by men well acquainted with the common law, as well as with the colonial and provincial regulations and practice of Massachusetts, we may well presume that the use of a common and popular, instead of a technical word, in this article of the declaration, was not accidental. The form in which the principle is expressed is also worthy of consideration. It is not prohibitory of a trial of an offence, in any other county than that in which it happened ; nor is it affirmative of a right m the citizen to be tried in any particular county. It is merely declaratory of the sense of the people, that the proof of facts in criminal prosecutions should be in the vicinity or neighbourhood where they happen. Whether it was not in *588 tended to vest the legislature with discretion to apply this principle, in their future laws, as strictly as could be done consistently with the jurisdiction and organization of the courts for the several counties, may perhaps be understood by recurring to the existing state of things in relation to the administration of criminal justice in the commonwealth, at the time when the declaration of rights was framed and adopted. It may be observed, that the declaration in question is not limited in its operation to crimes which are capital or otherwise of magnitude, but that it embraces all criminal trials, as well those for small misdemeanors, as those for crimes of a heinous nature punishable with death. So that the legislature, if restricted at all, have not authority to provide for the trial of any offence in any other county than that in which it happened.
Now by the common law the grand jury were confined m their inquiries, to offences committed within the body of the county for which they were returned, unless provision should be made by act of parliament for trial in other counties This parliamentary power was exercised in regard to many offences, according to the public sense of the necessity oi such provisions. 4 Bl. Com. 303. It may be considered questionable whether those who framed the bill of rights intended to tie the hands of the legislature, with the history of parliamentary proceedings before them, from which they could perceive the expediency, if not the necessity, of leaving the legislature without any other restriction than that which would be derived from respect to the declared sense of the people, that trials in the vicinity were always desirable, when they could be bad there without great inconvenience to the public. It must have been known also, that the principle of the common law limiting the trials of crimes to the county within which they were committed, had been necessarily departed from by our ancestors in the early history of the country ; for all capital felonies were cognizable only in the Court of Assistants, which court held its sessions only in Boston for the whole colony, and it was expressly ordained that the jurors attending this court should be summoned from the counties of Suffolk and Middlesex ; so that in whatever other county a capital offence was committed, it was necessarily tried in the *589 county of Suffolk. Vid. Ancient Charters and Col Laws &c., p. 90, 144. So under the provincial government after the charter of 1692, the Superior Court of Judicature, Court of Assize and General Gaol Delivery, was to be held at Plymouth for the counties of Plymouth, Barnstable and Dukes-County, and capital offences happening in all these counties were made cognizable at Plymouth, and the jurors were by the act directed to be summoned from the several towns within the county or jurisdiction of the court, manifestly considering all the towns within the jurisdiction as virtually within one county, though in fact belonging to several. St. 11 Will. 3, c. 3. Afterwards the Superior Court held one session annually at Barnstable for that county and Dukes, and the same provision with respect to summoning jurors from towns within the jurisdiction of the court was applied. St. 1 Geo. 2, c. 11. This being the state of things at the time of the adoption of the constitution, and the probable creation of new counties, whose population might not justify the sending of the Supreme Court into them, being probably foreseen, it may well be supposed that the wise men who framed the declaration of rights, when they proposed to the people to declare, that “ in criminal trials, the verification of facts in the vicinity where they happen, is one of the greatest securities of the life, liberty and property of the citizen,” intended to hold out a caution to all future legislatures to regard this principle, in their laws concerning crimes and punishments, but not to prohibit them from causing trials to be had in adjoining counties when the public interest should demand it. And that this has been the contemporaneous, practical and uniform construction of this article by the legislature and courts of law, from the adoption of the constitution down to the present period, may be safely inferred from many statutes which have passed, and judicial decisions which have taken place, in relation to this subject. Thus in the statute of 1782, c. 57, appointing the times and places for holding the Supreme Judicial Court, it is provided that the Court shall be holden at Barnstaule for Barnstable and Dukes-County, and at Falmouth, in the county of Cumberland, for the counties of Cumberland and Lincoln. And in June 1784 it was enacted, that the clerk should *590 issue his warrant directed to the constables of the several towns within the county or counties for which the Court should be holden. St. 1784, c. 4. So in 1791, the county of Lincoln having been before divided into three counties, and no provision having been made in the act of division for the holding of the Supreme Court for the counties of Hancock and Washington, an act passed giving the Court, when sitting in Lincoln, the same jurisdiction of matters, civil and criminal, happening within Washington or Hancock, as it had before the division of Lincoln ; and provision was made for summoning jurors to attend the Court in Lincoln, from the towns in the other two counties. A similar provision was made when the county of Oxford was created out of Cumberland, of Somerset out of Kennebeck, and of Penobscot out of Kennebeck. So more recently, in the years 1811 and 1812, on the division of the County of Hampshire into three counties, provision was made for the jurisdiction of the ESúpreme Judicial Court in Hampshire over capital offences happening in either o( the counties j and to show that these proceedings were not considered to be authorized merely in relation to counties which had been formerly united, the act of 1795, c. 81, may be referred to, which gives to the Supreme Judicial Court in Suffolk jurisdiction of offences committed in Nantucket, providing that in capital cases only, jurors, at the request of the prisoner, should be summoned from that county.
These frequent acts of the legislature abundantly show the public sense of the intention of the people in the declaration referred to ; and the judicial trials which have taken place out of the county in which the offences were committed have been numerous. Until the recent act, giving the Court ot Common Pleas, when sitting in the county of Nantucket jurisdiction of all crimes committed there, excepting such as are capital, all crimes committed there not cognizable by the Court of General Sessions or the Court of Common Pleas, according to the former jurisdiction of these courts, have been tried before the Supreme Judicial Court in Suffolk. Within the recollection of some of the Court, a murder committed in the county of Washington was tried in the count) of Hancock, the court sitting in Hancock for both counties *591 There was a conviction and execution. Recently a murder alleged to have been committed in Dukes-County was tried in Barnstable ; the accused was acquitted. Other cases of the kind have occurred which cannot be particularly recollected, but it is believed, that after the division of Hampshire, a capital offence committed in Hampden was tried in Hampshire, and on the trial exception was taken to the jurisdiction of the Court sitting in Hampshire, which was overruled. On these legislative and judicial practical expositions of the declaration in favor of trials in the vicinity we might repose with confidence, for contemporaneous and continued constructions of an instrument, whether by express judicial decisions, or uniform practice, are admitted to be a legitimate ground of interpretation. We admit the paramount force of a direct provision in the constitution or declaration of rights ; they are the laws by which the legislature itself is to be bound, and by which all its acts are to be judged of and construed. And we hold, that not only this tribunal, but that every magistrate is bound to enforce the constitution, if any of its principles should be violated. Neither will any course of years or legislative acts or judicial decisions sanction any apparent violation ol the fundamental law clearly expressed, or necessarily understood. But provisions of doubtful import, or words of ambiguous meaning, may and ought to receive their construction from such sources. And the article relied upon in the motion, is of this description.
There is however a shorter answer and a conclusive one to the motion, which would have rendered unnecessary this minute investigation ; were it not that the public discussion of the right of the .legislature to enact the statute on which the trial has taken place in this county, has made it necessary to show, that in former trials for capital offences there has been no violation of the constitution or declaration of rights.
Taking the article in the declaration of rights in the sense imputed to it by the counsel for the prisoners, viz. that by the word vicinity was intended county, so that the article would read, “ In criminal prosecutions the verification of facts in the county where they happen, is one of the greatest securities of the life, liberty and property of the citizen,” *592 and considering this as an absolute affirmative provision, m- ' stead of the declaration of a principle as a monition to the legislature to regard it as nearly as they can, consistently with the public good and necessity ; still we think the statute of 1795, c. 45, which provides for a trial in the county in which the death happened, where the stroke was given in another 'county, is not repugnant to that declaration. Murder is a complex term, denoting several facts, of which the death of the party is one of the most essential. The mortal stroke, or the administering of poison, does not constitute the crime, ^unless the sufferer dies thereof within a year "and a day. Not only the death therefore, but the circumstances of it, the connexion between that and the supposed cause, the manner in which the party has languished, the supervenience of some disease disconnected from the antecedent injury, the dying declarations of the deceased, and many other circumstances, may be important facts in the trial, and it may happen, and often does, that the mere giving the stroke was the least difficult fact to be settled. In this very case, the testimony of the physician, which was necessary to show that the death was the effect of the wounds received in Boston, comes from his visit to the wounded man in Middlesex; and the dying declaration of the deceased, in regard to one of the prisoners, was made in that county. Who will say that these facts are not at least as important as those which relate to the affray in which the blows were given ? If then the trial is to be had in the county where the facts happened, why even without legislative provision should not the trial be in Middle-sex as well as in Suffolk ? And if the trial had happened in the latter county, why would not the constitutional objection apply with as much force as it does now ?
If this be so, surely an act of the legislature which removes all doubt as to the place of trial, by designating the county in which the death happened, is in no respect a violation of the spirit or even the letter of the constitution.
The Parliament of Great Britain, as early as the reign of Edward 6, which was before the settlement of this country, enacted a similar statute. Indeed ours is but a copy of it. Before that statute a strange dilemma was supposed to result *593 from the common law principle, that offences must be tried in the county where they occur. If the mortal stroke was given in one county and the death happened in another, as the offence was not completed in either county, it was holden by some that the murderer must go free, because he could be tried in neither county. Others held that he might be tried in one or the other, wherever the indictment was found. These doubts produced the statute of Edward 6 ; and it was the possibility of like difficulties which suggested the propriety of enacting our statute.
For the foregoing reasons we think we are justified in saying there is no ground for questioning the validity of the statute, under which this trial proceeded. The counsel are to be commended for suggesting this point to the Court it being their duty to interpose every question which can arise in a fair mind, on a subject of so much importance. We should have readily yielded to the suggestion, if upon examination it had been found to rest on any constitutional principle, it being our highest duty to uphold the constitution, by which alone the legislative and judicial authorities exist.
After this opinion was delivered, it was moved in arrest ot judgment, that Job Wyeth, of Cambridge, one of the grand jurors who found the bill against the prisoners, was not properly on the grand jury, because the return of the venire for that town was not signed by any officer.
The prisoner’s counsel referred to St. 1784, c. 4, and St. 1807, c. 140, § 6, regulating the selection of grand jurors, and they read a manuscript report of the case of Commonwealth v. William Davis, drawn up by Dana and certified to be correct by Ward, now C. J. of the Court of Common Pleas, who was of counsel in the case. It was stated in that report, that Davis was convicted in 1794, in this county, of a capital offence, (burglary,) and that it was discovered after the verdict, that one Locke, who served on the grand jury, had not been chosen a grand juror, but that the name of one Burr, who had been chosen, had been erased from the return of the venire and Locke’s name inserted in its place ; that upon a motion in arrest of judgment, it was contended *594 on the part of the government, that as there were seventeen jurors besides Locke, the indictment was good, to which it was answered, and so considered by the Court, that there might have been eleven only without him who agreed to find the bill, and that the judgment was therefore arrested. In 2 Hawk. c. 25, § 28, it is said, “ that if any one of the grand jury, who find an indictment, be within any one of the exceptions in the statute (11 Hen. 4, c. 9), he vitiates the whole, though never so many unexceptionable persons joined with him in finding it.” See also Bac. Abr. Juries, A; Dovey v. Hobson, 6 Taunt. 460.
The Solicitor-General contended, 1. that the want of a proper return of the venire was not a valid objection to the legality of the conviction. The case of Davis was very different from this. Locke was not a grand juror. He was not elected a juror, and he was returned as such by means of a legal fraud. The quotation from Hawkins (which is in Bacon likewise) is a decision grounded on an express provision of the statute of 11 Hen. 4, that any indictment made in any point contrary to that statute should be void, revoked, and forever holden for none. And this is fully explained in 3 Inst. 32 et seq. He cited also to this first point, March, 81, pL. 132 ; Amherst v. Hadley, 1 Pick. 39 ; Commonwealth v. Hussey, 13 Mass. R. 221 ; The King v. Hunt, 4 Barn. & Ald. 430 ; Sparks v. Plunkington, 4 Yeates, (Penn.) 324 ; Commonwealth v. Drew, 4 Mass. R. 399.
2. The objection should have been made before the trial, and even before the indictment was filed. Commonwealth v. Smith, 9 Mass. R. 107 ; 11 H. 4, 41, pl. 8 ; 2 Hawk. c. 25, § 16 ; Commonwealth v. Clark, Brown, (Penn.) 328.
He also moved that the constable might be allowed to amend his return by signing it now.
Knapp, in reply, said that some of the cases cited on the part of the government related to traverse jurors, and were not applicable to grand jurors ; for the prisoner is furnished with a list of the traverse jurors, and has an opportunity to challenge, but the indictment may have been found against him in bis absence and before he knew that he was charged with committing an offence
*595 The Chief Justice, after a few minutes’ consultation with his brethren, said that the officer might now amend his return de bene esse; and he directed the officer to procure evidence of the time when he was chosen a constable.
The constable thereupon signed his return, and the Court took time to consider what should be the effect of the amendment.
At a subsequent day the constable made oath, that the return on the venire, except as to his signature, was made at the time it purported to be, (the 12th of March, 1824,) and that he returned the precept to the court himself. He also produced a certificate from the town clerk of Cambridge, that he was duly chosen a constable in March 1823, and was duly qualified, and that he was chosen again on the 1st of March, 1824, and was duly sworn on the 4th.
The sitting of the court to which the venire was returned, began on the 22d of March, 1824.
The Chief Justice then said the Court had considered the question, whether the indictment was void in consequence of the objection relating to the grand juror. The precedents in which such an objection has prevailed, have generally been cases where the juror was not qualified to serve. Hawkins refers to the statute of 11 Hen. 4, which recites that inquests had been taken at Westminster, of persons named to the justices, without due return of the sheriff, of which persons some were outlawed &c., and enacts that indictments so found shall be void, and that in future no indictment shall be made but by inquest of the king’s lawful liege people. The mischief was, that persons were put on the jury who were not qualified to serve. They were outlawed &c. and had no right to be on the jury. The case referred to, of Commonwealth v. Davis, proceeded on this same principle. A juror was there regularly chosen, and another man, who wanted to attend the Court, agreed to come in his place, and the constable unwarrantably assented to this arrangement; and the Court said the indictment should be set aside. The present case is very different. Here there was no objection to the qualifications of the juror. He was entitled to be drawn as a grand juror, and he was drawn, and had notice and attended, and was sworn *596 and allowed to act with the grand jury. If the error of the constable had been discovered at the time of impannelling the jury, the Court would have sent for him and have fined him. Whether the juror would have been suffered to sit on the jury until the return should have been amended, we do not say; though the case of Patterson, 6 Mass. R. 486, looks as if the Court would have allowed it. * There a traverse juror’s name was omitted in the return oi the venire, and the Court permitted him to make oath that the constable had summoned him to attend as a juror, and he was then put on the panel. That case is stronger than this, for there the return furnished no evidence that any particular individual had been drawn as a juror. Here the return wanted only the officer’s signature; and perhaps that was not necessary. The statute says he shall make a return of the venire with his doings thereon. Suppose he should not be able to write, but should get the blanks in the return filled up, and should return it into court. Perhaps that might be sufficient. But we do not decide that question. Here the return was duly made, except that the officer, through inadvertency, had omitted to affix his signature ; and this he has now done, and we think properly, by the permission of the Court. It is true, that in a capital case the Court would not permit the prisoner to be prejudiced by an amendment, but they are not bound to shut their eyes to the justice of the case, when an error in matter of form can be rectified without any prejudice to him. In the trial of a prisoner at the Newcastle assizes, for a capital felony, (12 East, 231, note,) Robert Curry, who served on the jury by which the prisoner was convicted, had answered to the natn'e of Joseph Curry, and had been sworn by that name. It appeared that there was a person of the name of Joseph Curry belonging to Newcastle, but that he was not resident there at that time, and that Robert Curry was qualified to serve on juries, and had been summoned to attend on the crown side as a juryman at that assize. Mr. Baron Eyre thought it was a mere misnomer and that after judgment it *597 could not be assigned as error; and the judges were unani- , - , . . mously of the same opinion.
It is objected that there is a difference between traverse jurors and grand jurors, because traverse jurors may be challenged. The books say that grand jurors also may be challenged. But there is a difficulty in the case, for a bill may be found against a person who has not been recognised to appear, and who has no opportunity to challenge. The case of Commonwealth v. Smith, 9 Mass. R. 107, if we should adopt the remarks there made on this subject in their full extent, would put an end to this motion in arrest. It is there said, that objections to the personal qualifications of the grand jurors, or to the legality of the returns, are to be made before the indictment is found. It is not necessary to apply the remark here, and we have some doubts as to the correctness of it in all cases ; and the case in which it was made was determined on another point.[1]
We decide the present case on the ground, that Wyeth was properly qualified to serve on the grand jury, and that the constable was properly allowed to amend his return.
The prisoners received sentence of death.

 See also Anonymous, 1 Pick. 196.

 See Queen v. Hepburn, 7 Cranch, 290 ; Fellows's case, 5 Greenl. 333 ; The People v. Jewett, 3 Wendell, 314 ; M‘Clure v. State, 1 Yerger, 206 ; Commonwealth v. Knapp, 10 Pick. 477.
If the sheriff return a talesman in a cause in which his deputy is a party, it is a good ground of challenge to the juror, but will not support a motion to Bet aside the verdict. Walker v. Green, 3 Greenl. 215.